### In re OLYMPIA BREWING COMPANY SECURITIES LITIGATION.

#### No. 77 C 1206.

United States District Court, N.D. Illinois, E.D.

April 20, 1987.

William T. Huyck, Nicholas J. Etten, Richard G. Schultz, Foran, Wizz & Schultz, Chicago, Ill., for plaintiff.

Steven L. Bashwiner, Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Ho-

ward R. Koven, Jenner & Block, H. Nicholas Berberian, Howard D. Lieberman, Therese M. Obringer, Neal, Gerber & Eisenberg, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

In the early spring of 1977, the price of several securities experienced a precipitous drop. Subsequently, seventeen separate actions were filed against Loeb Rhoades & Co. and Loeb Rhoades & Co., Inc. (collectively "Loeb Rhoades"). The seventeen cases, consolidated for discovery and trial, concern the alleged market manipulation of the common stocks of Stange Corp., Olympia Brewing Co., Lawry's Foods, Inc. and Fay's Drugs. The original pleadings ranged in kind from single-plaintiff and single-defendant complaints to multiple-party complaints. Some plaintiffs in their cases named as defendants individuals or entities who were plaintiffs in other cases.

Ten years later, after the matter was transferred to a different judge twice, after countless motions were briefed and ruled on and after settlement agreements were reached in the other cases, five cases remain. The plaintiffs in those cases are as follows:

(1) No. 77 C 3820 and 82 C 1519—Janet Smithson and Paul Smithson, as Executrices of the Estate of Paul B. Smithson, Jr. and others ("the Smithson Parties");

(2) No. 78 C 896—Turn-key Enterprises, Andrew C. Papas, A. Patrick Papas, and John T. Papas (collectively "the Turn–Key Parties");

(3) No. 78 C 2242—Richard M. Shure, Peggy Shure, Strombecker Corp. and Penta Capital (collectively "the Shure Parties");

(4) No. 81 C 3699—Louis Singer ("Singer") as successor in interest to Troster, Singer & Co.

The central figure linking these five cases is a former employee of Loeb Rhoades, Jack Bernhardt. Bernhardt allegedly informed his customers that the securities in question were takeover targets when in fact they were not. Based on this false information, the customers bought the securities. Bernhardt allegedly also bought, at times without authority, those same securities for his customer accounts. According to the complaints, these purchases artificially raised and maintained the prices of these securities. The essence of the plaintiffs' claims in this case is that Loeb Rhoades failed to supervise and control Bernhardt, failed to disclose information which it should have, and is liable for Bernhardt's actions based on respondeat superior. Loeb Rhoades denies that it acted wrongfully, denies responsibility for Bernhardt's actions, and accuses certain plaintiffs of wrongful conduct which either contributed to the fraud or kept Loeb Rhoades from discovering what Bernhardt was doing.[1]

The trial of these cases is scheduled to begin on Monday, May 4, 1987. In anticipation of trial, the parties have filed a number of motions to add to the already lengthy list of pending motions in this matter. The court will address each motion separately.

## I

## Loeb Rhoades' Motion for Leave to File Third Amended Counterclaim

Loeb Rhoades first moves the court for an order granting them leave to file its Third Amended Counterclaim.[2] According to Loeb Rhoades, the Third Amended Counterclaim modifies Loeb Rhoades' Final Amended Counterclaim to comport with prior orders of this court, reflect recent

---

1. The foregoing is a gross oversimplification of the lengthy factual background of these consolidated cases. The court intends for it to serve only as an introduction to the rest of this opinion.

2. Although Loeb Rhoades' newest amended counterclaim is actually its fourth, the court refers to it as the Third Amended Counterclaim because the parties refer to it as such in their briefs.

settlements and add an intent allegation to three of the remaining cases. The Shure Parties and the Smithson Parties object to any further amendment of the counterclaim on the grounds that the request for the amendment has been delayed without a valid reason and the amendment would unduly prejudice the affected plaintiffs.

In order to place this motion in proper perspective, the court must briefly review the history of Loeb Rhoades' counterclaim. Loeb Rhoades filed its Counterclaim on February 23, 1979 and its Amended Counterclaim on March 14, 1980. In response to a motion to dismiss, Judge Getzendanner dismissed four of the counts of the Amended Counterclaim but let Loeb Rhoades' indemnity and contribution claims survive subject to certain limitations she expressed in her opinion. *See Maryville Academy v. Loeb Rhoades & Co., Inc.,* 530 F.Supp. 1061, 1074 (N.D.Ill.1981). In the interests of clarifying the remaining claims, she directed Loeb Rhoades to file a second amended counterclaim which Loeb Rhoades did on February 26, 1982. On January 25, 1984, after a settlement of a class action in this group of consolidated cases, Loeb Rhoades moved to amend the prayer for relief in its counterclaim to seek recovery for settlements. On May 7, 1984, Judge Getzendanner granted Loeb Rhoades leave to file this counterclaim which Loeb Rhoades had optimistically but mistakenly dubbed its "Final Amended Counterclaim."

The Final Amended Counterclaim consisted of two counts seeking implied indemnity (Counts I and II), one count seeking implied contribution (Count III) and a final count seeking contractual indemnity pursuant to the customer agreements between certain plaintiffs and Loeb Rhoades (Count IV). After the plaintiffs named as counterdefendants ("counterdefendants") had moved to dismiss the Final Amended Counterclaim for failure to state a claim upon which relief can be granted, *see* Fed.R.Civ. P. 12(b)(6), the court granted the motion in part and denied it in part. *See In re Olympia Brewing Co. Securities Litigation,* No. 77 C 1206, slip op. at 20 (N.D.Ill. March

27, 1986) (Williams, J.) [Available on WESTLAW, 1986 WL 4188]. In summary, this court dismissed both implied-indemnity counts, dismissed the contribution count with respect to all counterdefendants except two,[3] and narrowed the contractual-indemnity count. The parties eventually stated they were ready for trial, so this court set a trial date of October 6, 1986. Scheduling difficulties forced the court to strike the October 6, 1986 trial date and reschedule the trial for April 6, 1987.

On February 5, 1987, two months before this ten-year old case was scheduled for trial, Loeb Rhoades filed its motion for leave to file its Third Amended Counterclaim. The most significant amendments are in Paragraphs 8 and 20, in which Loeb Rhoades has added the following underlined allegations:

8. During the period from approximately January 1, 1975 to March 15, 1977, counterdefendants and others, directly, or indirectly through their agents, conspired to, aided and abetted each other to and did secretly and fraudulently misuse the trading and credit facilities of Loeb Rhoades, other broker-dealers, and financial institutions as part of a fraudulent and manipulative scheme *with an intent* to enrich themselves at the risk and expense of others, including Loeb Rhoades, *and to manipulate the price of the Securities in order to enhance the price of any takeover or acquisition with respect to those Securities....*

Third Amended Counterclaim ¶ 8, at 5–6 (emphasis added);

20. Each of the counterdefendants named herein, if sued separately by a plaintiff other than itself in one of the lawsuits described in paragraph 5, *supra,* would have been liable to that plaintiff for that plaintiff's damages as described in its complaint as a result of the conduct alleged above. *The counterdefendants engaged in the same conduct alleged against Loeb Rhoades in each of the actions set forth in paragraph 5,*

---

**3.** Those counterdefendants were Swift, Henke & Co. and Richard Bertoldi.

*supra,* and did so with an intent to manipulate the price of the securities. *Id.* ¶ 20, at 8–9 (emphasis added).

According to the Federal Rules of Civil Procedure, a party may amend its pleading only by leave of court or by written consent of the adverse party; leave shall be freely given when justice so requires. Fed. R.Civ.P. 15(a). The spirit of the Federal Rules is that controversies shall be decided on the merits and not in a game of skill in which one misstep by counsel may be decisive to the outcome. *See Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). As the Supreme Court stated in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), only in certain rare cases should the court deny the movant leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

The first issue appropriate for discussion concerns whether the court should deny Loeb Rhoades' motion because the Third Amended Counterclaim fails to remedy the defects of the Final Amended Counterclaim. The Seventh Circuit permits a refusal to grant permission to file an amended pleading where the proposed amendment fails to allege facts which would support a valid theory of liability, or where the party moving to amend has not shown that the proposed amendment has substantial merit. *See, e.g., Goulding v. Feinglass,* 811 F.2d 1099, 1104 (7th Cir.1987); *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 204 (7th Cir.1985); *Textor v. Board of Regents of Northern Illinois Univ.,* 711 F.2d 1387, 1391 (7th Cir.1983). But since certain counterdefendants have filed a motion to dismiss the Third Amended Counterclaim (apparently in anticipation of this court's granting the motion for leave to file the Third Amended Counterclaim), the court will reserve extensive discussion of the merits of the Third Amended Counterclaim, if necessary, until after the court has considered the briefing on the motion to dismiss. For purposes of the motion to amend which this court is presently considering, the court briefly notes that Loeb Rhoades has included the allegation that the counterdefendants intended, by their actions, to manipulate the price of the securities at issue. *See* Third Amended Counterclaim ¶ 8, at 5–6; *id.* ¶ 20, at 8–9. By making this allegation, Loeb Rhoades remedies one of the defects discussed by this court in its March 27, 1986 opinion, i.e., the failure of the Final Amended Counterclaim to allege that the counterdefendants committed a fraud on the market. *See Olympia Brewing Co.,* slip op. at 15.

The other circumstance in which the court also can deny leave to amend is when the amending party is guilty of bad faith in delaying presentation of the amendment. *Textor,* 711 F.2d at 1391. Delay in presenting the amendment, however, will only be a sufficient basis for denial of leave to amend when the delay has caused the opposing party prejudice. *Id.; Hurn v. Retirement Fund Trust of the Plumbing, Heating and Piping Industry of Southern California,* 648 F.2d 1252, 1254 (9th Cir.1981). Here, although the court finds no evidence of bad faith, it finds plenty of undue delay. Loeb Rhoades does not explain adequately why it waited over ten months after the *Olympia Brewing Co.* opinion and two months before trial to file this motion. As the counterdefendants point out, no newly developed fact has arisen nor has a significant court decision been rendered recently. Nor did the amendment require extensive investigation or legal work. In short, the delay was inexcusable.

But the fact that the court finds it hard to forgive Loeb Rhoades for filing this so late in the game does not mean the court can reject the amendment. Instead, the court must also find undue prejudice to the opposing parties. Courts have found

undue prejudice in cases where the amendment results in the incorporation of a new claim, the addition of a party or expensive and time-consuming new discovery. *See Conroy Datsun Ltd. v. Nissan Motor Corp. in U.S.A.*, 506 F.Supp. 1051, 1054 (N.D.Ill.1980) (Aspen, J.). Where the facts on which a previously unasserted claim is based are all known or available to all parties, no prejudice exists. *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 694 (8th Cir.1981). Even if some prejudice to the adverse party results if the court grants a motion to amend, the court must balance that prejudice against the hardship to the moving party if the court denies the motion. *Id.*

■ Here no new discovery would be required if this court granted the amendment. The amendment adds no new parties and no claims that have not been asserted before. Although the counterdefendants have been proceeding under the assumption that they had to defend against only a contractual-indemnity claim, Loeb Rhoades had asserted the implied-indemnity and contribution claims for at least six years prior to this court's dismissal of those claims on March 27, 1986. The mere assertion that the parties assumed for ten months that they would not have to defend against the implied-indemnity and contribution claims is not enough in a ten-year old case such as this to show prejudice. Since the court has moved the trial date to May 4, 1987, the counterdefendants will have been aware of the motion to amend for three months and of this court's ruling for at least two weeks before the case goes to trial. That is adequate time to prepare.

For the foregoing reasons, the court grants Loeb Rhoades' motion for leave to file its Third Amended Counterclaim.

## II

### Counterdefendants' Motion to Dismiss Counts I and II of the Third Amended Counterclaim

In its Third Amended Counterclaim, Loeb Rhoades names as counterdefendants the Smithson Parties, the Turn-Key Parties and the Shure Parties.[4] *See* Third Amended Counterclaim ¶ 3, at 2–3. According to the Third Amended Counterclaim, during the period from approximately January 1, 1975 to March 15, 1977, the counterdefendants, directly or indirectly through their agents, conspired to, aided and abetted each other to and did secretly and fraudulently misuse the trading and credit facilities of Loeb Rhoades, other broker-dealers and financial institutions as part of a fraudulent and manipulative scheme. *Id.* ¶ 8, at 5–6. The counterdefendants allegedly committed the aforesaid acts with the intent to enrich themselves at the risk and expense of others, including Loeb Rhoades, and to manipulate the price of the securities at issue in this case in order to enhance the price of any takeover or acquisition with respect to those securities. *Id.* ¶ 8, at 6. The counterdefendants move this court to dismiss the Third Amended Counterclaim for failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), and argue that the Third Amended Counterclaim fails to remedy the defects of the Final Amended Counterclaim as discussed in this court's earlier opinion. *See Olympia Brewing Co.*, slip op. at 6–20. Alternatively, the counterdefendants urge the court to reconsider the rationale of that opinion.

Loeb Rhoades unquestionably seeks to comport its counterclaim with this court's orders. Yet it is apparent to this court that the parties' interpretations of this court's March 27, 1986 order differ drastically. Loeb Rhoades believes that it has remedied the defects in its implied-indemnity and implied-contribution claims by the addition of the allegation that the counterdefendants acted with an intent to manipulate the market. But the counterdefendants believe that, for Loeb Rhoades to state a claim for either implied indemnity or implied contribution, Loeb Rhoades must allege more than a mere intent to manipulate the market; they must instead allege that the

---

4. Loeb Rhoades does not name Singer as a counterdefendant in the Third Amended Counterclaim.

counterdefendants participated *in Bern-hardt's scheme* to manipulate the market.

 Due to the parties differing interpretations of that March 27, 1986 order, the court will use this opportunity to clarify its earlier order and to narrow the issues relevant to a trial of this matter. Before doing so, the court briefly will review the standards for ruling on this motion to dismiss. The court must accept the well-pleaded allegations of the counterclaim as true. *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1040 (7th Cir.1987). In addition, the court must view those allegations in the light most favorable to Loeb Rhoades. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1104 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). In considering the motion the court must limit the record to the language of the counterclaim and to those matters of which the court may take judicial notice. *Gomez*, at 1039. The counterdefendants cannot attempt to refute the allegations of the counterclaim or to present a different set of allegations. *Id.* at 1039. The attack is on the sufficiency of the counterclaim; therefore the counterdefendants must demonstrate that Loeb Rhoades' claims, as set forth in the Third Amended Counterclaim, are legally insufficient. *Id.*

In Count I of its Third Amended Counterclaim, Loeb Rhoades alleges that any liability imposed or to be imposed on Loeb Rhoades in any of the seventeen original consolidated cases was or will be based solely on principles of derivative or secondary liability. Third Amended Counterclaim ¶ 19, at 8. Stated differently, Loeb Rhoades claims that any settlements it has paid or damages it will have to pay were or will be founded on the acts of an agent or employee of Loeb Rhoades. Loeb Rhoades in Count I asserts that since the counterdefendants participated in a scheme to manipulate the price of the relevant stock in the market and since any liability of Loeb Rhoades arose or will arise solely by operation of law, each of the counterdefendants is jointly and severally liable to Loeb Rhoades for the entire amount of any such liability or settlement pursuant to princi-

ples of indemnity. *Id.* In Count II, Loeb Rhoades alternatively requests that if the court finds Loeb Rhoades is liable to any plaintiff in the seventeen consolidated cases, the court also find that each of the counterdefendnts is liable to Loeb Rhoades according to principles of contribution. *Id.* ¶ 21, at 9.

 Before proceeding further, the court must clarify what is meant by "indemnity" and "contribution," because the terms are oftentimes confused. When the court requires an individual to indemnify a party liable for money damages, the court shifts *the entire loss* from one tort-feasor who has been compelled to pay the loss to the shoulders of another who should bear the loss instead. W. Prosser, *The Law of Torts* § 51, at 310 (4th ed. 1971). Although the court can discern no general rule for deciding when to allow indemnification, courts have permitted indemnification where the indemnitor owed a duty to the indemnitee, a great difference in the gravity of the fault of the two tort-feasors exists, or a difference in character of the duties owed by the two tort-feasors exists. *Id.* § 51, at 313 (cases cited therein). When the court concludes that contribution amongst joint tort-feasors is appropriate, the court distributes the loss among joint tort-feasors by the court's requiring each tort-feasor to pay *his proportionate share*. *Id.* § 51, at 310. If several parties combine to create an injury, but only one of them faces legal responsibility for discharging the mutual obligation of making the injured person whole, the right of contribution gives the defendant recourse against his co-participants and thereby prevents unjust enrichment of the co-participants at the defendant's expense. Note, *Judicial Implication of Contribution Under Section 10(b) of the Securities Exchange Act: Is the New Branch on the Judicial Oak Threatened by Strict Statutory Construction,* 16 Suffolk U.L.Rev. 983, 984 (1982).

 As already stated, Loeb Rhoades seeks indemnity and contribution from the counterdefendants for any liability Loeb Rhoades has incurred or will incur in any of the seventeen original suits filed

against it. The court will not attempt to recount here the numerous statutes and theories under which those seventeen suits were filed. For present purposes, the court will divide the entire body of legal claims asserted against Loeb Rhoades into two categories—federal-law claims and state-law claims. Where indemnity and contribution are sought by Loeb Rhoades for paying damages for having violated a federal statute, the court must treat the question of the scope and limitations of indemnity and contribution as a question of federal law. *See, e.g., Donovan v. Robbins,* 752 F.2d 1170, 1179 (7th Cir.1985) (the court decided whether contribution is available under the ERISA statutes); *Heizer Corp. v. Ross,* 601 F.2d 330, 331 (7th Cir. 1979) (contribution in Rule 10b–5 cases). If Loeb Rhoades' liability is grounded on state law, however, state law controls the question of the scope and limitations of indemnity and contribution. *See, e.g., Central Illinois Sav. & Loan Ass'n v. DuPage County Bank of Glendale Heights,* 622 F.Supp. 1493, 1495–96 (N.D.Ill.1985) (Shadur, J.) (availability of indemnity based on liability for common-law fraud). Because the federal-law claims predominate, the court will address the availability of indemnity for damages based on federal law first.

### A. Federal Securities–Law Claims

■ The plaintiffs in these seventeeen cases filed suit based largely on the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1981) and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78b–78kk (selected sections) (1981). Although the parties in their briefs devote little attention to the question of whether the court has the authority to require indemnity or contribution,[5] that question is the threshold issue for the court to resolve here. In the Securities Act of 1933 and the Securities Exchange Act of 1934, no provision expressly provides for a right of indemnity and only three sections provide for a right of contribution.[6] Of the

legal claims asserted by the plaintiffs in these consolidated cases, only section 9 of the Securities Exchange Act of 1934, dealing with the manipulation of security prices, expressly provides for a right of contribution. *See* 15 U.S.C. § 78i(e) (1981). Since Congress did not expressly provide the right of indemnity or contribution under the provisions at issue here (with the exception of section 9 of the Securities Exchange Act), those rights can be created in one of two ways. First, the court may conclude, based on the analysis for recognizing an implied right of action, *see, e.g., Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 839, 78 L.Ed.2d 645 (1984); *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), that Congress intended for those rights to be created. *See Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 90, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981). Second, the court may find a claim for indemnity or contribution should become a part of the federal common law through which federal courts have fashioned appropriate remedies for unlawful conduct. *Id.*

■ If this were not a federal securities case, the analysis would be fairly straightforward. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court established a four-part test to determine whether a statute includes an implied right of action: (1) whether the plaintiff is one of the class for whose "especial benefit" the statute was enacted, (2) whether there is any explicit or implicit indication of legislative intent either to create or deny a private right of action, (3) whether an implied remedy is consistent with the statute's underlying purposes, and (4) whether the cause of action is traditionally within the province of state law. *See Cort,* 422 U.S. at 78, 95 S.Ct. at 2088. Subsequent decisions of the Court, however, narrowed the inquiry to a focus on legislative intent. *See, e.g., Daily Income*

---

5. The court did not discuss the issue of authority in its March 27, 1986 opinion.

6. Those three sections are section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (1981) and sections 9 and 18 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i, 78r (1981).

*Fund, Inc.*, 104 S.Ct. at 839; *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377–78, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979). *Accord Schrachta v. Curtis*, 752 F.2d 1257, 1258 (7th Cir.1985). As the Court stated in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), "when Congress wishe[s] to provide a private damages remedy it [knows] how to do so and [does] so expressly." *Touche Ross & Co.*, 442 U.S. at 572, 99 S.Ct. at 2487. Although the focus should be on legislative intent, the Court permits consideration of the other *Cort* factors to determine the intent of Congress.[7] *Daily Trust Fund, Inc.*, 104 S.Ct. at 839. *Accord Schrachta*, 752 F.2d at 1258–59. Regardless of what formula the Court has applied, it is safe to say that a strong presumption now exists against the creation of private rights of action by implication. *See Community and Economic Dev. Ass'n of Cook County, Inc. v. Suburban Cook County Area Agency on Aging*, 770 F.2d 662, 664 (7th Cir.1985).

■ The Supreme Court's admonitions against expansion of the federal common law are as clear as its admonitions against reading federal statutes broadly so as to imply a right of action. In *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), the Court acknowledged that federal courts have fashioned federal common law in "some limited areas." *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). But the Court added the following:

These instances are "few and restricted," *Wheeldin v. Wheeler*, 373 U.S. 647, 651 [83 S.Ct. 1441, 1445, 10 L.Ed.2d 605] (1963), and fall into essentially two cate-gories: those in which a federal rule of decision is "necessary to protect uniquely federal interests," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 [84 S.Ct. 923, 939, 11 L.Ed.2d 804] (1964), and those in which Congress has given the courts the power to develop substantive law, *Wheeldin v. Wheeler, supra*, [373 U.S.] at 652 [83 S.Ct. at 1445].

*Id.* While the court can give concrete meaning and application to broadly worded statutory provisions, *see Northwest Airlines, Inc.*, 451 U.S. at 95, 101 S.Ct. at 1582, the court cannot, in the face of a comprehensive legislative scheme including an integrated system of procedures for enforcement, fashion new remedies that might upset carefully considered legislative programs. *See Northwest Airlines, Inc.*, 451 U.S. at 97, 101 S.Ct. at 1583.

Applying these principles to other cases, the Supreme Court rejected the defendants' claims for contribution in a civil rights case under the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964, *see Northwest Airlines, Inc.*, 451 U.S. at 98–99, 101 S.Ct. at 1584, and in an antitrust case under the Sherman and Clayton Acts. *See Texas Industries, Inc.*, 451 U.S. at 646–47, 101 S.Ct. at 2069–70. The rationale of those Supreme Court cases has been held to be applicable to cases barring claims for indemnity as well. *See Central Illinois Sav. & Loan Ass'n*, 622 F.Supp. at 1498 (the court barred indemnity in a civil RICO case); *Anderson v. Local Union No. 3, Int'l Brotherhood of Electrical Workers*, 582 F.Supp. 627, 633 (S.D.N.Y.1984) (the court barred indemnity in a civil rights case), *aff'd*, 751 F.2d 546 (2d Cir.1984).

But since this case is a federal securities case, the analysis is far more complex. The Supreme Court began giving claims for an implied right of action the cold shoulder starting with *Cort* in 1975 and the Court's frigidity has increased ever since.[8]

---

7. A narrow reading of legislative intent which restricted the inquiry to the words of the statute would lead to the absurdity of the court attempting to *imply* a right of action from the *express* words of the statute.

8. The Court recently wrote the following:

"The development of our framework for determining whether a private cause of action exists has proceeded only in the last 11 years, and its inception represented a significant change in our approach to congressional silence on the provision of remedies."

At another time, federal courts, relying primarily on common-law tort principles, were much more receptive to conferring rights of action on private litigants. *Community & Economic Dev. Ass'n,* 770 F.2d at 664. In 1964, the Supreme Court in *J.I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) expressly approved of an implied right of action under section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1981). *See J.I. Case Co. v. Borak,* 377 U.S. 426, 431–35, 84 S.Ct. 1551, 1559–61, 12 L.Ed.2d 423 (1964). The Court justified its finding not on congressional intent but rather on a theory of the need for private enforcement to supplement the work of the Securities Exchange Commission and thereby add a deterrent for potential violations. *See id.* at 432, 84 S.Ct. at 1559. Subsequent to its decision in *Cort,* the Supreme Court reluctantly succumbed to twenty-five years of lower-court findings and recognized an implied remedy under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (1981). *See Touche Ross & Co.,* 442 U.S. at 577–78 n. 19, 99 S.Ct. at 249 n. 19.

Since the plaintiffs' legal claims in this case include a claim based on section 10(b) of the Securities Exchange Act of 1934 as well as other federal securities laws, the dilemma confronting this court is whether to apply pre–*Cort* or post–*Cort* principles in deciding whether an implied right of indemnity or contribution exists for damages assessed pursuant to section 10(b). Moreover, if the court finds that such a right exists it must decide what effect that decision has on the rest of the federal securities laws that do not expressly provide for indemnity or contribution. The Court will address the question of indemnity and the question of contribution separately.

### 1. Indemnity

Without discussion of the implied-right-of-action or federal-common-law issues, courts uniformly have denied defendants the right to indemnity in federal securities law cases where those defendants acted with an intent to commit a violation of those laws. *See Heizer Corp.,* 601 F.2d at 334; *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Kilmartin v. H.C. Wainwright & Co.,* 637 F.Supp. 938, 940 (D.Mass.1986); *Seymour v. Bache & Co., Inc.,* 502 F.Supp. 115, 117 (S.D.N.Y.1980); *Nelson v. Quimby Island Reclamation Dist.,* 491 F.Supp. 1364, 1381 (N.D.Cal.1980); *Marrero v. Abraham,* 473 F.Supp. 1271, 1276 (E.D.La. 1979); *McLean v. Alexander,* 449 F.Supp. 1251, 1266 (D.Del.1978), *rev'd on other grounds,* 599 F.2d 1190 (3d Cir.1979); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 135 (S.D.N.Y.1974), *aff'd in relevant part,* 540 F.2d 27 (2d Cir.1976); *DeHaas v. Empire Petroleum Co.,* 286 F.Supp. 809, 815 (D.Colo.1968), *aff'd in relevant part,* 435 F.2d 1223 (10th Cir.1970). These courts generally based their rejection of the indemnity claim on public-policy grounds and on an analysis of the purposes of the federal securities laws. Since the main objective of the federal securities laws is to deter future misconduct rather than compensate the injured party, these courts feared that permitting indemnity might frustrate the congressional policy of deterring securities fraud. *See Globus,* 418 F.2d at 1289; *Kilmartin,* 637 F.Supp. at 940. The Seventh Circuit also viewed this result as a mere extension of general principles regarding indemnification, for the common law bars tort-feasors from restitution for their damage liability if the tort involved "seriously wrongful conduct." [9] *See Heizer Corp.,*

*Merrell Dow Pharmaceuticals, Inc. v. Thompson,* — U.S. —, 106 S.Ct. 3229, 3234, 92 L.Ed.2d 650 (1986).

9. Some authority exists in this circuit for the proposition that indemnity is available even to intentional securities-law violators. The Seventh Circuit in *Madigan, Inc. v. Goodman,* 498 F.2d 233 (7th Cir.1974) rejected the defendant's third-party complaint for indemnity as it stood because if the plaintiff were victorious under its complaint, the theory of liability would have been inconsistent with the defendant's theory of indemnity. The court refused, however, to dismiss the indemnity claim entirely because it stated that the theories of liability could change in the course of the proceedings. *See Madigan, Inc. v. Goodman,* 498 F.2d 233, 238 (7th Cir. 1974). The case could be read for the proposi-

601 F.2d at 334 (quoting *Restatement of Restitution* § 88 (1937)).

While the federal courts consistently state that indemnity is not available in cases of intentional violation of the federal securities laws, the courts have differing views on whether indemnity is available if the defendant's liability is based solely on negligence. One court adopted what this court terms the "comparative standard" and held that, in cases where a gross disparity in the nature of the misconduct between the offending parties exists, the less culpable defendant can obtain indemnity from the defendant who is significantly more responsible for the injury to the plaintiff. *See Adalman v. Baker, Watts & Co.*, 599 F.Supp. 752, 754 (D.Md.1984). *Cf. In re Financial Partners Class Action Litigation*, 597 F.Supp. 686, 688 (N.D.Ill.1984) (Leighton, J.) (court refused to dismiss an indemnity claim of a defendant accused of having violated the Commodities Exchange Act, 15 U.S.C. § 713a–7 (1976)). Another court rejected an indemnity claim in a case of intentional misconduct, but suggested its holding would have been different had liability been based solely on negligence. *See Nelson*, 491 F.Supp. at 1381. A third court expressly rejected the proposition that a negligent securities-law offender could get indemnity because the court claimed allowing indemnification would be contrary to the deterrent policy of the securities laws. *See Odette v. Shearson, Hammill & Co., Inc.*, 394 F.Supp. 946, 957 (S.D.N.Y.1975). Denying indemnification encourages the reasonable care required by the federal securities provisions. *Id. See also Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672, 676 (9th Cir.1980) (the court stated that permitting indemnity for violations of the Securities Act of 1933 would undermine the statutory purpose of assuring diligent perform-

ance of duty and deterring negligence), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981); 2 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 5.7(277), at 5:82.82 (1983) (the policy of denying indemnification so as to encourage carefulness applies as strongly, perhaps more strongly, to the negligent as it does to the intentional wrongdoer).

Loeb Rhoades contends that it is an even better candidate for indemnity than the negligent wrongdoer because its liability in this case, if any, will be based solely on the operation of law, not on negligent, much less purposeful, misconduct on its part.[10] Loeb Rhoades argues that in cases such as this, where the court finds that a defendant without fault still should be held liable, permitting that defendant to obtain indemnity from the real wrongdoers at fault would not subvert the deterrent purpose of the federal securities laws. This argument is not without some support. In *Thomas v. Duralite Co., Inc.*, 386 F.Supp. 698 (D.N.J. 1974), the court decided that where a corporation's liability attaches solely through the operation of law, that corporation is not barred from seeking indemnification from those employees whose unlawful conduct saddled the corporation with vicarious liability. *Thomas v. Duralite Co., Inc.*, 386 F.Supp. 698, 728 (S.D.N.J.1974). Other courts have suggested the same although they were not forced to address the issue directly. *See Marrero*, 473 F.Supp. at 1275; *McLean*, 449 F.Supp. at 1266 n. 49. In her opinion in this case addressing the counterdefendants' motion to dismiss the First Amended Counterclaim, Judge Getzendanner concluded "that Loeb Rhoades may seek indemnity from Bernhardt's co-conspirators for any liability based solely on the doctrine of respondeat superior." *Maryville Academy*, 530 F.Supp. at 1071.

---

tion that indemnity is available even if a defendant acted intentionally to violate the federal securities laws. But the Seventh Circuit subsequently rejected that proposition in *Heizer Corp. v. Ross*, 601 F.2d 330, 334 (7th Cir.1979) without citation to *Madigan, Inc.* In light of the ambiguity of *Madigan, Inc.* and the clear language of *Heizer Corp.*, this court regards *Heizer Corp.* as the law in this circuit.

**10.** While this contention is certainly debatable since the plaintiffs sue Loeb Rhoades for its own intentional and negligent conduct as well as under a theory of vicarious liability, the court will not quibble with Loeb Rhoades; instead the court assumes the contention is true solely for purposes of deciding the motion to dismiss the Third Amended Counterclaim.

This court essentially adopted Judge Getzendanner's ruling in the court's March 27, 1986 opinion. *See Olympia Brewing Co.,* slip op. at 12–15 (the court dismissed the implied-indemnity counts because Loeb Rhoades had failed to allege that the counterdefendants knowingly participated in Bernhardt's scheme to defraud the market).[11]

What is remarkable about the evolution of the case law in this area is the complete failure of the courts to address the question of the court's *authority* to create a right of indemnity.[12] Regardless of the policy implications, if the Congress did not intend for there to be such a right or for the courts to develop federal common law in this area, the court is powerless to do anything about it. *See Northwest Airlines, Inc.,* 451 U.S. at 90, 101 S.Ct. at 1580. The first commandment of judicial restraint is that the federal lawmaking power does not vest in the judicial branch of the government but rather in the legislative. *Id.* at 95, 101 S.Ct. at 1582. While this commandment applies to all areas of federal law, it is especially relevant to the securities area, for the Supreme Court repeatedly has admonished the federal courts to pay greater attention to legislative intent when the courts interpret the liability sections of the securities laws. *See, e.g., Aaron v. Securities Exchange Comm'n,* 446 U.S. 680, 695–700, 100 S.Ct. 1945, 1955–58, 64 L.Ed.2d 611 (1980); *Chiarela v.*

*United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980); *Sante Fe Indus. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977).

As this court stated earlier, to determine whether a federal statute impliedly creates a private right of action, the court principally must attempt to discern the intent of Congress. *See, e.g., Daily Income Fund, Inc.,* 104 S.Ct. at 839. The Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") constitute interrelated components of the federal regulatory scheme governing transactions in securities; the interdependence of the securities laws is a factor this court should take into account in interpreting a particular provision. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976). Although the 1933 and 1934 Acts contain eight different sections that afford express rights of action for private parties,[13] none provide for the express right of indemnity for an offending party. Moreover, the legislative history of the 1933 and 1934 Acts makes no mention of indemnity.[14]

While the intent of the legislature may be divined from other factors, *see Daily Income Fund, Inc.,* 104 S.Ct. at 839, consideration of those factors leads the court to conclude that Congress never intended to provide for the right to indemnity. Obviously, Congress did not promul-

---

**11.** Although the court has not chosen to do so, it could have dismissed a portion of Count I of the Third Amended Counterclaim because Loeb Rhoades failed to remedy the defect the court mentioned in its earlier opinion. The Third Amended Counterclaim still fails to allege that the counterdefendants participated in Bernhardt's scheme.

**12.** The court suspects that much of the confusion is a result of the Supreme Court's narrowing of the circumstances in which federal courts can imply a right of action, a narrowing that began with *Cort* in 1975. The seminal case on the issue of indemnity is considered to be *Globus v. Law Research Service, Inc.,* 418 F.2d 1276 (2nd Cir.1969), *cert. denied,* 393 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970), which was decided six years before *Cort* and twelve years before *Northwest Airlines, Inc.* Although little case law exists on the issue, the existing cases relied heavily on *Globus,* in which the court

based its rejection of indemnity on policy grounds and not on judicial-authority grounds. *See Globus,* 418 F.2d at 1288–89.

**13.** Those provisions of the 1933 Act are the following: section 11(a), 15 U.S.C. § 77k(a) (1981); sections 12(1) and 12(2), 15 U.S.C. §§ 77*l*(1) and (2) (1981); and section 15, 15 U.S.C. § 77o (1976). The provisions of the 1934 Act are the following: section 9(e), 15 U.S.C. § 78i(e) (1981); section 16(b), 15 U.S.C. § 78p(b) (1981); section 18(a), 15 U.S.C. § 78r(a) (1981); and section 20(a), 15 U.S.C. § 78t(a) (1981).

**14.** The legislative history of the 1933 and 1934 Acts has been compiled in a multi-volume set entitled *Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934* (compiled by J. Ellenberger and E. Mahar) (1973).

gate the 1933 and 1934 Acts to protect the parties who violate the Acts' provisions. In fact, the immediate concern of Congress was not to insure that parties injured by fraudulent activities were reimbursed but rather was to prevent future fraudulent activity. *See, e.g., Globus,* 418 F.2d at 1289. The United States in 1933 and 1934 was in the midst of a prolonged period of depression which Congress believed was caused in large part by excessive stock-market speculation. S.Rep. No. 792, 73d Cong., 2d Sess. 3 (1934). Congress imposed civil liability on offenders of the Acts because experience had shown that criminal liability alone was insufficient to deter further wrongdoing. *Id.* at 12. Some courts that have interpreted the 1933 and 1934 Acts have already concluded that providing a right to indemnity would undermine the deterrent purpose of the Acts. *See Globus,* 418 F.2d at 1289; *Kilmartin,* 637 F.Supp. at 940. But for purposes of deciding this court's authority to find an implied right of indemnity, it is sufficient for this court to say that it certainly is not clear that implying such a right would further the deterrent purpose of the 1933 and 1934 Acts.

■ Furthermore, because this court does not find that any uniquely federal interests are involved or that Congress has given the federal courts the power to develop substantive law in this area, the court rejects the notion that a right to indemnity could arise under the securities laws as part of the federal common law. Indemnity does not implicate "uniquely federal interests" as defined by the case law because indemnity among securities wrongdoers does not involve the duties of the United States, the distribution of power in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority. *See Texas Industries, Inc.,* 451 U.S. at 642, 101 S.Ct. at 2068. In light of the comprehensive nature of the federal securities laws, it is unlikely that Congress intended for the courts to fashion remedies other than those provided in the Acts. *See Northwest Airlines, Inc.,* 451 U.S. at 97, 101 S.Ct. at 1583.

■ Although the analysis may be different, the result does not change merely because the federal courts have already implied a right of action under section 10(b) of the 1934 Act. If Congress had considered the issue it is unlikely they would have found a right to indemnity when they did not provide for such a remedy in the case of the eight express rights of action under the federal securities laws. Even if this court were to decide solely on policy grounds the issue of whether Loeb Rhoades should be indemnified, the court would respond in the negative for the following reasons. The Seventh Circuit has decided that indemnity is not available to federal securities-law violators because allowing indemnity would undermine the deterrent purpose of those laws. *See Heizer Corp.,* 601 F.2d at 334. Moreover, in this circuit, the plaintiffs can charge Loeb Rhoades with liability for the unlawful acts of its agent Bernhardt under the common-law doctrine of respondeat superior in addition to a control-person theory pursuant to section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a) (1981). *See Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir.1981), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981). The reason courts hold broker-dealers like Loeb Rhoades liable even if they arguably acted in good faith has to do with the prominent status of brokerage firms in the securities industry. When investors make their initial choice of a broker, they rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whom they might deal. *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1119 (5th Cir.1980) (the court discussed the reasons for applying common-law principles of agency to the federal securities laws). Allowing a brokerage firm to avoid secondary liability merely by showing ignorance would contravene the congressional intent to protect the public, particularly unsophisticated investors, from fraudulent practices. *Id.* at 1118–19. Certain employers such as brokerage firms assume a higher public duty under the securities laws than do other persons, a duty that requires the affirmative exercise of a high standard

of supervision. *See Sharp v. Coopers & Lybrand,* 649 F.2d 175, 181–82 (3rd Cir. 1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 142, 71 L.Ed.2d 648 (1982); *Paul F. Newton & Co.,* 630 F.2d at 1119; *Holloway v. Howard,* 536 F.2d 690, 696 (6th Cir.1976); *Jones v. First Equity Corp. of Florida,* 607 F.Supp. 350, 352 (E.D.Tenn.1985). This court will not permit Loeb Rhoades to recover the full amount of its liability from the counterdefendants for a federal securities-law violation because doing so would mean implicit subversion of the affirmative duty Loeb Rhoades has to prevent its employees from using their firm's status to defraud the market.[15]

## 2. Contribution

Because courts usually have denied defendants a right to indemnity in federal securities cases on public-policy grounds, the courts' failure to discuss the judicial-authority issue was inconsequential to the outcome of those cases. But because courts have had a differing perspective on the policy effects of allowing contribution in those same cases, failing to discuss the judicial authority to require contribution may have had a significant impact on the cases' outcomes. But before this court confronts the judical authority issue head on, the court deems it appropriate to review the precedent on this issue even if the court later decides that that precedent was built on a foundation of sand.

The first case to address the issue of contribution in a federal securities case was *DeHaas v. Empire Petroleum Co.,* 286 F.Supp. 809 (D.Colo.1968), *aff'd in relevant part,* 435 F.2d 1223 (10th Cir.1970), in which the court held that contribution is available under section 10(b) of the 1934 Act to intentional wrongdoers. *See DeHaas,* 286 F.Supp. at 816. The *DeHaas* court reasoned that since federal courts had created civil liability under section

10(b) and since other sections of the 1933 and 1934 Acts that provide for a right of action also expressly provide for contribution,[16] the court should permit contribution in section 10(b) cases. *Id.* The holding of *DeHaas* became the general rule in federal securities cases as a number of courts implied a right of contribution in section 10(b) cases. *See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 578 (2d Cir.1982), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed. 2d 80 (1982); *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 n. 7 (2d Cir.1981); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 559 (5th Cir.1981), *rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Heizer,* 601 F.2d at 334; *Jordan v. Madison Leasing Co.,* 596 F.Supp. 707, 711 (S.D.N.Y.1984); *Marrero,* 473 F.Supp. at 1278; *Stratton Group Ltd. v. Sprayregen,* 466 F.Supp. 1180, 1185 (S.D.N.Y.1979); *McLean,* 449 F.Supp. at 1266–67; *Alexander & Baldwin, Inc. v. Peat, Marwick, Mitchell & Co.,* 385 F.Supp. 230, 238 (S.D.N.Y.1974); *Herzfeld,* 378 F.Supp. at 135; *Globus, Inc. v. Law Research Service, Inc.,* 318 F.Supp. 955 (S.D.N.Y.1970), *aff'd,* 442 F.2d 1346 (2d Cir. 1971), *cert. denied,* 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971). In addition to the rationale given by the *DeHaas* court, the rationale courts generally gave for permitting contribution in section 10(b) cases was the policy argument that contribution furthers the deterrent purpose of the federal securities laws. *See, e.g., Tucker,* 646 F.2d at 727 n. 7; *Heizer Corp.,* 601 F.2d at 331; *Marrero,* 473 F.Supp. at 1278; *Alexander & Baldwin, Inc.,* 385 F.Supp. at 238; *Herzfeld,* 378 F.Supp. at 135. According to this argument, apportioning the loss among joint wrongdoers, even intentional wrongdoers, will insure that the deterrent effect of the judgment will be felt by all culpable parties. *Marrero,* 473 F.Supp. at 1278; *Alexander & Baldwin, Inc.,* 385 F.Supp. at 238; *Herzfeld,* 378 F.Supp. at 135.

**15.** In so holding, the court has reconsidered its March 27, 1986 opinion and explicitly rejects the notion that Loeb Rhoades can be indemnified from the counterdefendants even if they conspired with Bernhardt to defraud the market. Since Loeb Rhoades does not seek indemnity from Bernhardt, the court need not address the issue of whether an employer can be indemnified from its employee for violations of the federal securities laws such as those alleged in this case.

**16.** *See supra* note 6.

But some courts have not stopped with section 10(b). Using both the logic of De-Haas for implying rights and the deterrent rationale, other courts implied a right of contribution in cases where the plaintiff's right of action was provided for *expressly* in a provision of the federal securities laws but in which a right of contribution was not provided.[17] *See Adalman*, 599 F.Supp. at 750–51 (allowed contribution for liability under section 12(2) of the 1933 Act); *Odette*, 394 F.Supp. at 958 (section 12(2) of the 1933 Act); *Getter v. R.G. Dickinson & Co.*, 366 F.Supp. 559, 569 (S.D. Iowa 1973) (section 12(2) of the 1933 Act).

Only one court has addressed the judicial authority issue directly. In *In re National Student Marketing Litigation*, 517 F.Supp. 1345 (D.D.C.1981), the court denied a motion to dismiss a contribution claim in a section 10(b) case because "thus far, the Supreme Court has not restricted the implication of contribution rights under the securities law." *In re National Student Marketing Litigation*, 517 F.Supp. 1345, 1349 (D.D.C.1981) (cited with approval in *Seiler v. E.F. Hutton & Co., Inc.*, 102 F.R.D. 880, 886 (D.N.J.1984)). In support of this statement, the court relied on two footnotes in *Northwest Airlines, Inc.* and *Texas Industries, Inc.* in which the Supreme Court stated that it intimated no view as to the decisions of lower courts allowing contribution in federal securities cases. *Id.* at 1348–49 (citing *Northwest Airlines, Inc.*, 451 U.S. at 91 n. 24, 101 S.Ct. at 1580 n. 24 and *Texas Industries, Inc.*, 451 U.S. at 640 n. 11, 101 S.Ct. at 2078 n. 11). But it is apparent from reading those footnotes that the Court simply did not wish to address the securities question in those opinions; certainly the Court did not intend to place its stamp of approval on contribution in federal securities cases. The *National Student Marketing* court also claimed that the Supreme Court's denial of certiorari in *Frank v. United States*

*Trust Co.*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) "leaves the lingering assumption that rights of contribution may be implied under section 10(b)" because the court below in *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672 (9th Cir.1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) had allowed contribution. *National Student Marketing*, 517 F.Supp. at 1349. This argument suffers from two defects. First, in the Ninth Circuit case cited by the *National Student Marketing* court, section 10(b) was not implicated. Second, the law is well-settled that a denial of a petition for a writ of certiorari carries with it no implication whatever regarding the Supreme Court's views on the merits of the case the Court refused to review. *See, e.g., Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1949). This court consequently refuses to adopt the reasoning of *National Student Marketing*.

▮▮▮▮ This court's discussion of its authority to create a right to indemnity under the federal securities laws applies equally to contribution, so the court will not repeat itself here. Because of the number of cases involved in this consolidated matter, the court will begin with a statement of principles outlining whether contribution is available to Loeb Rhoades for liability under a particular provision of the 1933 or 1934 Act. Of course, if the provision expressly provides for a right of contribution, Loeb Rhoades has one. In the case of a provision that expressly provides for a right of action but not for contribution, the court finds that it has no authority to imply or create a right to contribution.[18] Given that Congress provided the right of action expressly in certain provisions of the legislative enactment,[19] it seems reasonable for this court to assume that if Congress had intended to allow for a right to contribution under one of those provisions Con-

---

17. The provisions that expressly provide a right of action but not of contribution are section 9, 15 U.S.C. § 78i (1981) and section 18, 15 U.S.C. § 78r (1981) of the 1934 Act and section 12, 15 U.S.C. § 77*l* (1981) and section 15, 15 U.S.C. § 77o (1981) of the 1933 Act.

18. This category includes the control-person provisions of the 1933 and 1934 Acts. *See* 15 U.S.C. §§ 77o, 78t(a) (1981).

19. *See supra* note 6.

gress would have provided for one expressly.

But with regard to section 10(b) of the 1934 Act, the court's analysis must be slightly different. Since federal courts have implied a right of action under section 10(b), for the court to now focus on legislative intent in deciding the contribution issue would be incongruous with the analysis that created a section 10(b) right of action. *See* Loewenstein, *Implied Contribution Under the Federal Securities Laws: A Reassessment*, 1982 Duke L.J. 563–64. Consequently, this court must turn to the policy question of whether contribution *should* be implied for section 10(b) actions. Since the Seventh Circuit in *Heizer Corp. v. Ross*, 601 F.2d 330 (7th Cir.1979) held that the deterrent policy underlying the securities laws is reinforced by allowing contribution,[20] *see Heizer Corp.*, 601 F.2d at 332, this court is bound to answer the policy question in the affirmative. Loeb Rhoades therefore has a right to contribution for damages imposed on the basis of section 10(b) liability.

If the same conduct violates section 10(b) as well as a federal securities provision which provides for a right of action but not contribution, the foregoing may change. In those instances for the court to allow contribution would mean undermining the apparent congressional intent against allowing contribution for the conduct at issue. Consequently, the court is inclined, should such a situation arise, to forbid contribution even for section 10(b) violations in those cases. For the court to find otherwise would mean replacing its own view of public policy for that of Congress.

If Loeb Rhoades has a right to contribution, it can assert that right against "joint tort-feasors," a term which has been defined in differing ways in federal securities cases. This court rejects the counterdefendants' argument that the counterdefendants must have been participating in Bernhardt's scheme for Loeb Rhoades to have a right to contribution. *But see Getter*, 366 F.Supp. at 569 (the right to contribution "must be related to the cause of action pleaded in the complaint against the third-party plaintiffs"). If the objective of contribution is to insure that no wrongdoer escapes, the mere fact that one wrongdoer acted independently from another is irrelevant so long as both contributed to the injury in question. *See Adalman*, 599 F.Supp. at 755; *Jordan*, 596 F.Supp. at 711 (a finding that parties are joint tort-feasors is based on common liability to the injured party and not necessarily upon the same tort); *Marrero*, 473 F.Supp. at 1277 (the court allowed contribution from an independent but concurrent wrongdoer to insure a fair distribution of damages). Consequently, this court holds that if Loeb Rhoades is found to have violated a federal securities provision allowing for contribution and is found liable for damages under that provision, Loeb Rhoades has a right of contribution against a counterdefendant whose intentional wrongdoing contributed to the injury for which Loeb Rhoades was assessed damages.[21]

### B. RICO Claims

This court already has considered and rejected Loeb Rhoades' claims for indemnity and contribution for any liability for which it may be subject under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1984). *See Olympia Brewing Co.*, slip op. at 16–17. The court's rejection of this claim is consistent with the Supreme Court's re-

---

**20.** The *Heizer Corp.* conclusion may be subject to criticism; contemporary analysis exists indicating that a rule denying contribution in section 10(b) cases may provide as great a deterrent to future wrongdoing as a rule permitting contribution. *See* Easterbrook, Landes & Posner, *Contribution Among Antitrust Defendants: A Legal and Economic Analysis*, 23 J.Law & Econ. 331, 349 (1980). This court takes no position on the issue here.

**21.** Moreover, if contribution is available under a particular provision of the securities laws, to insure that the deterrent purpose served by contribution is fulfilled the court will allow contribution for liability under that provision even if Loeb Rhoades is found to be an intentional as opposed to a negligent wrongdoer. *See Marrero*, 473 F.Supp. at 1278; *McLean*, 449 F.Supp. at 1267; *Odette*, 394 F.Supp. at 958.

strictive analysis for implied rights of actions. *See Miller v. Affiliated Financial Corp.*, 624 F.Supp. 1003, 1004 (N.D.Ill. 1985) (Shadur, J.) (the court rejected the defendants' indemnity and contribution claims for liability under RICO); *Central Illinois Sav. & Loan Ass'n*, 622 F.Supp. at 1498–1500 (no indemnity for RICO liability); *Boone v. Beacon Bldg. Corp.*, 613 F.Supp. 1151, 1154 (D.N.J.1985) (no contribution for RICO liability). The court finds no reason here to reconsider its earlier ruling.

### C. Common–Law Claims

■ The plaintiffs also assert that Loeb Rhoades committed certain common-law violations, including fraud and breach of its duty to supervise its employees. *See, e.g.,* Shure Parties Final Amended Complaint, Counts III and IV at 13–15. Since the actions giving rise to the plaintiffs' common-law claims occurred between 1974 and 1977, Loeb Rhoades has no right to contribution under Illinois law. The right to contribution, first provided by the Supreme Court of Illinois in *Skinner v. Reed–Prentice Division Package Machinery Co.*, 70 Ill.2d 1, 15 Ill.Dec. 829, 834, 374 N.E.2d 437, 442 (1977), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978) and then codified by the Illinois legislature in the Contribution Among Joint Tortfeasors Act ("Contribution Act"), Ill.Rev.Stat. ch. 70, ¶¶ 301–305 (1985), only applies to causes of action arising out of occurrences on or after March 1, 1978. *Van Slambrouck v. Economy Baler Co.*, 105 Ill.2d 462, 86 Ill. Dec. 488, 491, 475 N.E.2d 867, 870 (1985); Ill.Rev.Stat. ch. 70, ¶ 301 (1985). Illinois courts consistently dismiss contribution claims based on occurrences prior to that date.[22] *See, e.g., Van Slambrouck*, 86 Ill. Dec. at 491, 475 N.E.2d at 870; *MFA Mut. Ins. Co. v. Crowther, Inc.*, 120 Ill.App.3d 387, 75 Ill.Dec. 903, 908, 458 N.E.2d 71, 76 (1st Dist.1983).

■ Although this court recently determined that the Contribution Act extinguished any implied right to indemnity under Illinois law, *see TRW, Inc. v. Dart Indus., Inc.*, No. 84 C 3049, slip op. at 16 (N.D.Ill. March 6, 1986) [Available on WESTLAW, 1986 WL 3327], the court's holding does not apply to causes of action which occurred prior to March 1, 1978 and hence are not covered by the Contribution Act. Under Illinois law, the doctrine of implied indemnity developed hand-in-hand with the earlier Ilinois rule against contribution. *See Heinrich v. Peabody Int'l Corp.*, 139 Ill.App.3d 289, 93 Ill.Dec. 544, 547, 486 N.E.2d 1379, 1382 (1st Dist.1985) (cases cited therein). Illinois courts permitted implied-indemnity claims in order to ameliorate the harshness of the no-contribution rule. *See id.* Since the birth of a right to contribution was the reason for the death of indemnity, *see id.*, this court interprets Illinois law to require the resurrection of implied indemnity where contribution is unavailable under the Contribution Act, Ill.Rev.Stat. ch. 70, ¶ 301 (1985). *Cf. Van Slambrouck*, 86 Ill.Dec. at 491–92, 475 N.E.2d at 870–71 (for a cause of action that occurred prior to March 1, 1978, the court rejected an implied-indemnity claim solely because the third-party plaintiff failed to establish a pre-tort relationship with the third-party defendant).

■ Consistent with the rest of the history of this counterclaim, the court confronts one of the most muddled areas of Illinois law. *See* Bua, *Third–Party Practice in Illinois: Express and Implied Indemnity*, 25 DePaul L.Rev. 287, 300 (1976). According to the Supreme Court of Illinois, in a case such as this where the third-party plaintiff has no right to contribution because the cause of action occurred prior to March 1, 1978, the third-party plaintiff must allege in its third-party complaint (1) a pre-tort relationship between the third-party plaintiff and the third-party defendant, and (2) a qualitative distinction between the conduct of the third-party plaintiff and the third-party defendant. *See Van Slambrouck*, 86 Ill.Dec. at 491, 475

---

**22.** Illinois courts have rejected the argument that Loeb Rhoades made to Judge Getzendanner in *Maryville Academy*, 530 F.Supp. at 1074, that the Contribution Act refers to the date that the tortfeasor pays more than its pro rata share of an adverse judgment. *See, e.g., Van Slambrouck*, 86 Ill.Dec. at 491, 475 N.E.2d at 870.

N.E.2d at 870. In 1976, while still a Circuit Court Judge of Cook County, Judge Bua termed the status of the pre-tort relationship requirement "very nebulous" in his law-review article on indemnity in Illinois. *See* Bua, 25 DePaul L.Rev. at 300. This court will not attempt to write the seminal opinion defining "pre-tort relationship" for all purposes; instead, the court will consider the facts of this case in light of the reasons for the origin of the pre-tort relationship requirement.[23]

■ Under Illinois law, a party may be indemnified if held derivatively liable for damages caused by another. *See* Bua, 25 DePaul L.Rev. at 296. This derivative liability, which may have resulted from a legal doctrine such as respondeat superior, a lease arrangement, or a statutory tort, entitles the indemnitee to indemnity because the indemnitee's liability is due solely to the technicalities of a legal doctrine or statute. *See id.* The classic pre-tort relationships giving rise to a duty to indemnify include lessor-lessee, employer-employee, master-servant and contractor-subcontractor. *See Van Slambrouck*, 86 Ill.Dec. at 491–92, 475 N.E.2d at 870–71; *Morizzo v. Laverdure*, 127 Ill.App.3d 767, 83 Ill.Dec. 46, 51, 469 N.E.2d 653, 658 (1st Dist.1984).

The key notion for our purposes is that in each of the above instances, the court held that the indemnitee was liable as a matter of law on the basis of the acts of the indemnitor. In this case, Loeb Rhoades unquestionably would be entitled to indemnity from its employee Jack Bernhardt if he were a counterdefendant because if Loeb Rhoades is found liable based on a theory of respondeat superior it will be due to Bernhardt's acts. But the same cannot be said for the alleged actions of the counterdefendants. While Loeb Rhoades effectively alleges in its counterclaim that the counterdefendants committed certain acts which contributed to the plaintiffs' injury, that allegation is not enough under this court's understanding of a pre-tort relationship. Loeb Rhoades cannot possibly be found liable based on the alleged actions of one of the counterdefendants. In summary, since Loeb Rhoades cannot be found liable for the acts of the counterdefendants, the counterdefendants have no implied duty to indemnify Loeb Rhoades for any common-law liability.

### D. Failure to Plead Fraud With Particularity

■ Although a portion of Loeb Rhoades' contribution claim still remains in the race, that portion has another hurdle to leap. This court thus far has held that Loeb Rhoades in theory could request contribution if Loeb Rhoades is found liable under certain provisions of the federal securities laws.[24] To state a claim for contribution, however, Loeb Rhoades must still perform the mechanical task of pleading that claim as required by the Federal Rules of Civil Procedure. The essence of Loeb Rhoades' claim in Count II is that the counterdefendants participated in a "fraudulent scheme" designed to manipulate the price of the securities at issue. *See* Third Amended Counterclaim ¶ 8, at 5–6. According to Rule 9(b) of the Federal Rules, "the circumstances constituting fraud or mistake shall be stated with particularity." This requirement applies to counterclaims as well as complaints. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1297, at 406 (1969). Moreover, Rule 9(b) governs claims based on fraud and made pursuant to the federal securities laws. *See Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir.1975); *Lincoln Nat'l Bank v. Lampe*, 414 F.Supp. 1270, 1278 (N.D.Ill.1976) (Decker, J.).

---

**23.** Some courts prior to the passage of the Contribution Act were so concerned by the harshness of the no-contribution rule that they eliminated the requirement of a pre-tort relationship in cases in which the disparity in fault was great. *Jethroe v. Koehring Co.*, 603 F.Supp. 1200, 1202 (S.D.Ill.1985). The Illinois Supreme Court in *Van Slambrouck*, however, makes no exception to the requirement of a pre-tort relationship. Under *Erie Railroad Co. v. Tompkins*,

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court cannot question the wisdom of the Supreme Court of Illinois on questions of Illinois law.

**24.** Those provisions are section 10(b) of the 1934 Act and any provision that expressly provides for a right of contribution.

To satisfy the requirements of Rule 9(b), Loeb Rhoades need not plead the basis for its fraud claim in exhaustive detail. The court must view the particularity requirement of Rule 9(b) as derivative of the liberal notice-pleading requirement of Rule 8. *See Tomera,* 511 F.2d at 508. "Slightly more" is needed for Rule 9(b) than for Rule 8. *See id.* Courts generally are satisfied that allegations of fraud are adequate if the pleadings allege the time, place and particular contents of the false representations as well as the identity of the parties involved and the injury incurred thereby. *See McKee v. Pope, Ballard, Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 930 (N.D.Ill.1985) (Getzendanner, J.); *D & G Enterprises v. Continental Illinois Nat'l Bank,* 574 F.Supp. 263, 267 (N.D.Ill. 1983) (Aspen, J.); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–23 (2d ed. 1985). *Cf. Tomera,* 511 F.2d at 509

(the court found that alleging the nature of the fraud, some details, a brief sketch of how the scheme operated, when and where it occurred, and the participants was satisfactory).

The crucial allegations in the Third Amended Counterclaim are contained in paragraph 9.[25] Although Loeb Rhoades exhaustively alleges the *types* of transactions which the counterdefendants engaged in, Loeb Rhoades fails to focus in on the particulars of any one of the transactions. Loeb Rhoades first does not allege the time or place of any transaction as required by Rule 9(b). *See, e.g., Winkler v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 642 F.Supp. 122, 125 (N.D.Ill.1986) (Aspen, J.); *McKee,* 604 F.Supp. 931; *Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 575 F.Supp. 214, 220 (N.D.Ill.1983) (Aspen, J.), *aff'd,* 782 F.2d 723 (7th Cir.

---

**25.** Paragraph 9 reads as follows:

The secret, fraudulent and deceitful conduct alleged in paragraph 8 included but was not limited to the following acts, practices and courses of conduct by the Shures, Myron B. Shure, Alan H. Shure, the Smithsons, the Papas Brothers, and Turn–Key:

(a) fraudulently placing or ratifying orders for the purchase of large quantities of the Securities without disclosing their intention not to complete these purchases on the settlement date of the transaction;

(b) falsely misrepresenting to Loeb Rhoades that funds were on hand sufficient to pay for the Securities ordered when, in fact, no such funds were on hand;

(c) fraudulently writing checks to pay for the Securities drawn on accounts with insufficient funds therein, with the secret intent to cover the checks by subsequent deposits of money from the sale of the same Securities;

(d) fraudulently misrepresenting to Loeb Rhoades that they intended to pay for the Securities ordered on the settlement date;

(e) secretly borrowing and lending funds among themselves and others to purchase the Securities without disclosing the existence of these loans to Loeb Rhoades;

(f) fraudulently obtaining funds to purchase the Securities by agreeing to pledge as collateral for loans, securities which could not be pledged as collateral for these loans, in violation of Section 7(f) of the Securities Exchange Act of 1934. 15 U.S.C. § 78g(f);

(g) fraudulently concealing from Loeb Rhoades and others the fact that in obtaining funds to purchase the Securities, they had engaged in violations of Regulations U and/or X promulgated by the Federal Reserve Board. 12 C.F.R. §§ 221.1 *et seq.,* 224.1 *et seq.;*

(h) obtaining extensions of time to pay for the securities by fraudulently misrepresenting to Loeb Rhoades and others that payment for the securities was forthcoming;

(i) placing or ratifying orders for large quantities of the Securities with the secret knowledge or expectation that another person or entity would acquire the same shares if the person or entity placing the order was unwilling or unable to pay for the shares on the settlement date;

(j) fraudulently opening several accounts at Loeb Rhoades and other broker-dealers without disclosing to Loeb Rhoades their intention of using these multiple accounts to deceive Loeb Rhoades and circumvent Loeb Rhoades' internal regulations and controls;

(k) fraudulently concealing from Loeb Rhoades and the public their knowledge of and participation in a scheme wherein certain persons and entities were purchasing large quantities of the Securities from Loeb Rhoades with the intention of improperly forming a syndicate and offering for sale and selling participations in the syndicate;

(*l*) fraudulently concealing from Loeb Rhoades and the public their intent to act as a group for the purpose of acquiring, holding, and/or disposing of the Securities in violation of Section 13(d) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder;

(m) fraudulently concealing the existence of this conduct from Loeb Rhoades, the market, and others by material omissions and misrepresentations.

1986). More importantly, Loeb Rhoades does not specify how any one of the many counterdefendants participated in the alleged fraudulent scheme; instead, Loeb Rhoades simply lumps the counterdefendants together. Courts repeatedly have rejected such group allegations for Rule 9(b) purposes. *See Bruss Co. v. Allnet Communication Services, Inc.*, 606 F.Supp. 401, 405 (N.D.Ill.1985) (Nordberg, J.); *McKee*, 604 F.Supp. at 931; *D & G Enterprises*, 574 F.Supp. at 267; *Adair v. Int'l Resources Corp.*, 526 F.Supp. 736, 744 (N.D.Ill.1981) (Moran, J.); *Lincoln Nat'l Bank*, 414 F.Supp. at 1278. The overly general allegations leave each counterdefendant wondering which specific transactions are at issue on the counterclaim and whether that counterdefendant participated in the particular transaction alleged to have occurred. Since the court views the main function of the Rule 9(b) particularity requirement to be giving the adverse party adequate notice of the claim, *see* 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1298, at 415 (1969), the court finds the allegations of Count II to be inadequate.

▆▆▆ Loeb Rhoades correctly asserts that when the alleged fraudulent transactions are numerous and take place over an extended period of time, Rule 9(b) requires less specificity than it normally requires. *Citing In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation*, 583 F.Supp. 1388, 1398 (E.D.Pa.1984). *See also Baselski v. Paine, Webber, Jackson & Curtis, Inc.*, 514 F.Supp. 535, 540 (N.D.Ill. 1981) (Bua, J.). But even in the most complex securities cases, those same courts blessed the allegations at issue only because they included at least the identity of the individual who made the misrepresentation. *See Catenalla*, 583 F.Supp. at 1398; *Baselski*, 514 F.Supp. at 540 (the complaint in this case set forth the time and place of the misrepresentation as well). The universal concern of the courts is that the adverse party have notice of the specific claim against them. The counterdefendants are entitled to the same here.[26]

## Conclusion

▆▆▆ The court dismisses Counts I and II of the Third Amended Counterclaim. Because this is the first time that the counterdefendants have made the Rule 9(b) argument in the long history of the counterclaim, the court gives Loeb Rhoades leave to file another amended counterclaim within six (6) days which remedies the Rule 9(b) defects mentioned in this opinion.[27]

**26.** Although the question remains in this case whether the counterdefendants' claims are defeated if the counterdefendants committed the misconduct that Loeb Rhoades alleges, *see Maryville Academy*, 530 F.Supp. at 1070 n. 14, the court concludes that since Loeb Rhoades made these allegations in the form of a counterclaim as opposed to an affirmative defense, that question is not properly before the court on this motion. *See Cavexsa (U.S.A.), Inc. v. Nassau Tool Works, Inc.*, No. 85 C 9102, slip op. at 3 (N.D.Ill. Nov. 19, 1986) (Williams, J.) [Available on WESTLAW, 1986 WL 13742] (an affirmative defense undermines the validity of a claim while a counterclaim is a separate and distinct claim for relief).

**27.** Since fraudulent intent may be averred generally, *see* Fed.R.Civ.P. 9(b), Loeb Rhoades' general-intent allegation satisfies the pleading requirements of the Federal Rules. *See* Third Amended Counterclaim ¶ 8, at 5–6. Moreover, although Loeb Rhoades alleges in circuitous fashion that the counterdefendants' acts caused the plaintiffs' injury for which Loeb Rhoades might be held liable, *see* Third Amended Counterclaim ¶ 20, at 8–9, the court, reading the

counterclaim liberally, deems the allegation satisfactory. In so holding, the court expressly reserves ruling on the evidence Loeb Rhoades plans to introduce at trial regarding the counterdefendants' alleged intent to manipulate the market of the securities at issue.

The court, however, has been reviewing one of the exhibits that Loeb Rhoades seeks to use at trial and to which the counterdefendants object. Through the exhibit, Defendants' Ex. No. 3008, Loeb Rhoades seeks to argue that its evidence that the Shure Parties illegally obtained the money they used to invest in the Bernhardt transactions is probative of the Shure Parties intent to manipulate the market. The court disagrees. Based on that evidence alone it is just as likely that the Shure Parties were convinced that the proposed transaction was a superb investment, an investment so good that they would do anything, including illegal acts, to make it. The court at this point expresses only its inclination and will consider further arguments in support of exhibits such as Defendants' Ex. No. 3008 before ruling.

From the moment this case was transferred to this court, the counterdefendants have vocif-

## III

### Counterdefendants' Motion for Summary Judgment on Count III of the Third Amended Counterclaim

■ The counterdefendants also move for summary judgment on Count III of the Third Amended Counterclaim. The court can grant summary judgment only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether any issue of material fact is in dispute, the court must view the inferences drawn from the record in the light most favorable to Loeb Rhoades. *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986).

■ In Count III of its Third Amended Counterclaim, Loeb Rhoades seeks express indemnity from the counterdefendants based on a provision ("indemnity clause") of the Customer's Agreement and Consent to Loan of Securities ("customer agreement") signed by each counterdefendant. In relevant part, the indemnity clause provides as follows:

In the event any action or proceeding is commenced or claim or demand made by any person, firm, corporation or other entity against any account of the [customer], or the securities or other property therein, or against [Loeb Rhoades] in connection with such account, securities or other property, the [customer] agrees to reimburse [Loeb Rhoades] for any loss, cost or expense, including reasonable attorneys' and accountants' fees, which may be incurred by [Loeb Rhoades] in connection therewith.[28]

Judge Getzendanner and this court, when analyzing the indemnity clause, consistently have rejected the literal reading of the indemnity clause on public-policy grounds. *See, Olympia Brewing Co.* (March 27, 1986), slip op. at 19; *Maryville Academy,* 530 F.Supp at 1071–72. A literal interpretation of the customer agreement would require a customer not even accused of any wrongdoing to indemnify Loeb Rhoades for liability imposed on Loeb Rhoades due to its own intentional misconduct. Since both Judge Getzendanner and this court recognized that a literal reading of the customer agreement violates the well-settled rule against indemnification for intentional misconduct, *see, e.g., Austro v. Niagra Mohawk Power Corp.*, 66 N.Y.2d 674, 676, 496 N.Y.S.2d 410, 487 N.E.2d 267 (1986), both rejected Loeb Rhoades' contention that an innocent customer must indemnify Loeb Rhoades for Loeb Rhoades' intentional wrongdoing.

The courts' suggestions regarding the proper scope of the indemnity clause have varied depending on the court's vision of the scope of implied indemnity in this case. But the courts agree that the customer agreement can allow for indemnity of federal securities-law liability only to the extent of Loeb Rhoades' implied right of indemnity. *See Maryville Academy,* 530 F.Supp. at 1072. This holding is consistent with the case law providing that a party cannot contractually create or expand a

erously argued that Loeb Rhoades has no evidence of the "fraudulent scheme" alleged in the counterclaim. According to the counterdefendants, Loeb Rhoades' objective is to convince the jury that the counterdefendants are bad people undeserving of a damage award as well as to confuse the jury in what is otherwise a clear-cut case. After the pre-trial conferences discussing proposed exhibits, the court fears that the counterdefendants' argument may have some validity. Loeb Rhoades has presented no evidence this court considers probative of the alleged fraudulent scheme. Due to the obvious prejudicial nature of evidence such as Ex. No. 3008, the court orders Loeb Rhoades to make a *written* offer of proof outlining its evidence relating to the counterclaim and the means by which Loeb Rhoades will introduce such evidence. The written offer of proof should take priority over other pre-trial matters and is to be filed by Friday, April 24, 1987. The counterdefendants will be given an opportunity to respond.

**28.** Paragraph 22 of the customer agreement provides that any controversies arising in the construction of a provision of the agreement shall be determined by arbitration. But because neither side has invoked the arbitration provision in the ten years since this matter began, the court deems that the parties have mutually agreed against arbitration of this dispute. *Cf. County of Middlesex v. Gevyn Constr. Corp.*, 450 F.2d 53, 56 (1st Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1176, 31 L.Ed.2d 232 (1972).

right to indemnity for federal securities-law liability. *See Globus*, 418 F.2d at 1288. Since this court has rejected on policy as well as judicial-authority grounds the proposition that Loeb Rhoades is entitled to implied indemnity even if found to be only vicariously liable under the federal securities laws, the court finds that Loeb Rhoades cannot be indemnified for federal securities-law violations under the customer agreement regardless of Loeb Rhoades' degree of fault. The same holds true for violations of RICO.

■■■■ What remains is the possibility of indemnity pursuant to the customer agreement for common-law liability. The customer agreement explicitly provides that the law of New York shall govern the agreement's interpretation; in this regard, the parties' intention as expressed in the agreement binds the court. *See Tele–Controls, Inc. v. Ford Indus., Inc.*, 388 F.2d 48, 51 (7th Cir.1967). Under New York law, indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury. *See, e.g., Austro*, 66 N.Y.2d at 676, 496 N.Y.S.2d 410, 487 N.E.2d 267; *Public Service Mutual Ins. Co. v. Goldfarb*, 53 N.Y.2d 392, 398, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981). Moreover, a court cannot find that an indemnity clause insulates a party from liability for that party's own negligence unless the clause expresses that intention in unequivocal terms. *See, e.g., Niagra Frontier Transp. Auth. v. Tri–Delta Constr.*, 107 A.D.2d 450, 487 N.Y.S.2d 428, 430 (4th Dept.1985). If the indemnification agreement was negotiated at arm's length between sophisticated business entities, the intent being to allocate the risk of liability to third parties between themselves essentially through the employment of insurance, the rule requiring an unequivocal expression of intent has been somewhat liberalized. *Id.*

Because the counterdefendants have attached only the customer agreement to their motion, this court is unable to grant them summary judgment. Too many relevant questions remain unanswered. These questions include the sophistication of the parties involved as well as the circumstances under which the agreement was reached. While court cannot grant the counterdefendants summary judgment, the court is skeptical that this agreement was meant to require that an innocent customer must indemnify Loeb Rhoades for any liability imposed on Loeb Rhoades due to the intentional wrongdoing of a Loeb Rhoades employee such as Bernhardt. Therefore, unless Loeb Rhoades introduces evidence to the contrary, this court holds that as a matter of law the customer agreement provides that Loeb Rhoades can be indemnified by a customer for any common-law liability Loeb Rhoades incurs in connection with that customer's account only if the customer actively participated in the fraudulent scheme for which he brought suit. Regardless of the extent of the particular counterdefendant's wrongdoing, however, the court holds that the agreement does not require that counterdefendant to indemnify Loeb Rhoades for liability Loeb Rhoades incurs in connection with *other* customer accounts. Consequently, in cases where a counterdefendant is a co-defendant with Loeb Rhoades and Loeb Rhoades must pay damages due to common-law liability, Loeb Rhoades has no right to indemnity from that counterdefendant under the customer agreement for that case.[29]

A lingering issue not quite ripe for resolution remains. Under the framework the court has established, the possibility exists of Loeb Rhoades being held liable for both federal and common-law violations based on the same misconduct. Because Loeb Rhoades is not entitled to indemnity under federal law based on reasons already articulated, if Loeb Rhoades has a right to indemnity under the common law this court has a problem, for allowing indemnity under the common law would undermine the

---

**29.** To the extent any prior opinions of this court are inconsistent with this holding, the court has reconsidered those opinions.

deterrent objectives of the federal law, since the same misconduct is at issue. Other courts have successfully avoided this difficult issue, *see, e.g., First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon & Co.,* 631 F.Supp. 1029, 1036 (S.D.N.Y.1986), an issue which presents perplexing problems regarding federal-court power and authority. Without the benefit of the parties' briefs on the issue and the time to do the requisite analysis, the court presently is inclined to give the federal law priority because of what the court perceives to be the predominant interest of the federal government in deterring securities fraud. *Cf. Kohr v. Allegheny Airlines, Inc.,* 504 F.2d 400, 403 (7th Cir.1974) (the court imposed a federal law of contribution and indemnity in an airplane-collision case due to the predominant interest of the federal government in regulating the affairs of the nation's airways), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). The court, however, intends merely to bring this issue to the attention of the parties for further consideration.[30]

### Conclusion

Pursuant to the terms of this opinion, the court denies the counterdefendants' motion for summary judgment on Count III of the Third Amended Counterclaim. The court requests that the parties evaluate their positions in light of this opinion prior to the pre-trial conference scheduled for 2:00 p.m. on Monday, April 20, 1987. The court will refrain from considering the other pending motions until after the conference.

---

**30.** To the extent the *Maryville Academy* opinion holds otherwise, *see Maryville Academy,* 530 F.Supp. at 1073, the court presently refuses to adopt the logic of that opinion.